Filed 8/29/13  P. v. Banks CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>LEON BANKS et al.,<br><br>      Defendants and Appellants. | B236152<br><br>(Los Angeles County<br>Super. Ct. No. BA347305) |

APPEAL from judgments of the Superior Court of Los Angeles County.  Gail Ruderman Feuer, Judge.  Affirmed with modifications.

Sharon M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant Leon Banks.

Law Offices of Pritz & Associates and Danalynn Pritz, under appointment by the Court of Appeal, for Defendant and Appellant Lovie Troy Matthews.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Marc A. Kohm and Peggy Z. Huang, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \*

Appellants Leon Banks and Lovie Troy Matthews appeal from judgments entered against them following their convictions by jury of first-degree murder (Pen. Code, § 187, subd. (a), count 1),[1] attempted second-degree robbery (§§ 664, 211, count 2), and second-degree commercial burglary (§ 459, count 3).  As to the murder charge, the jury found to be true the special circumstance allegation that it was committed in the course of committing an attempted robbery (§ 190.2, subd. (a)(17)).  As to all counts, the jury also found to be true the allegation that the offenses were committed for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)(C)), and the allegation that a principal personally and intentionally discharged a firearm causing great bodily injury and death (§ 12022.53, subds. (d) and (e)).  As to Banks, the jury also found to be true the allegation that he personally used a firearm (§ 12022.53, subd. (b)).

Appellants were sentenced to life without the possibility of parole on count 1.  The trial court imposed and stayed imposition of sentence for counts 2 and 3 pursuant to section 654.

Both appellants contend that the trial court erred in denying their motion to bifurcate the trial of the gang allegations.  Matthews contends there was insufficient evidence to support his convictions for the offenses and the gang enhancement.  Matthews further contends the court erred in failing to instruct the jury on the duration of the attempted robbery for purposes of assessing aider and abettor liability.  Banks contends the trial court erred in failing to appoint new counsel to represent him, and he received ineffective assistance of counsel.  Both appellants raise arguments about errors in the abstracts of judgment, which the People concede.

We agree that modifications must be made to the abstracts of judgment.  Finding no merit to appellants' other contentions, we affirm.

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

2

## FACTUAL AND PROCEDURAL BACKGROUND

**Prosecution Case**

### *Robbery and Homicide*

Daniel Sosa, Martin Chavero,[2] Matthew Salinsky, and Noe Campos Gonzalez worked at La Brea Collective, a medical marijuana dispensary located at 812 South La Brea Avenue in Los Angeles. The dispensary had a metal security door that provided access from the sidewalk. Behind the security door was a sally port, which was a secured room separated from the lobby. When patients knocked on the door they were allowed entry into the sally port where they were met by Gonzalez, the unarmed security guard. On proof of proper identification and a verified medical marijuana authorization, the patients were permitted to enter the dispensary through the lobby. Security cameras monitored the front door, the sally port, and the lobby.

In the afternoon of October 1, 2008, Chavero was standing by a display case on the ground floor of the dispensary when the doorbell rang. Sosa walked towards Chavero and pointed to the back of the dispensary. Chavero looked at the monitor and saw Gonzalez being escorted into the lobby by two African-American males armed with semiautomatic handguns. When Chavero heard Gonzalez say "Trucha," which he understood to mean "heads up," he followed Sosa and closed the safe which was located at the back of the dispensary.

Salinsky was assisting a patient in the upstairs loft area when he saw a man jump over the counter in the lobby area. Salinsky grabbed the patient and attempted to leave but threw himself to the ground when the gunman ran up the stairs and pointed a gun at him. The gunman was approximately six feet tall, average build, having short buzzed hair, and wearing a white shirt and blue pants. The gunman asked "Where's the shit at?" Salinsky told him it was behind the counter and to take whatever he wanted.

---

[2] Chavero was known as Martin Garcia at the time of the incident and subsequently changed his name. We refer to him throughout as Chavero.

Appellant Banks grabbed Chavero by the shoulder and pulled him and Sosa to the front area of the dispensary. Chavero turned and looked at Banks. Banks was approximately six feet tall and had a clean-cut beard. He wore glasses and one black glove. Banks told Chavero "If you look at me, I'll kill you." Banks forced Chavero and Sosa to the ground, placed his knee on Chavero's back, and attempted to put a zip-tie on Chavero's wrist. Chavero heard two gunshots and Banks said "Shit, we got to go. We got to go." Banks ran to the lobby.

Chavero looked at the monitor and saw Banks and two other men[3] in the sally port struggling to push their way out the front door. There was a glass window to the side of the sally port and Banks came back inside the lobby area and fired some shots through the window. Banks and the two other men were able to push their way outside and Chavero heard six or seven additional gunshots.

James Hustead was at a coffee shop on South La Brea Avenue located diagonally across the street from the dispensary when the shooting occurred. He saw Gonzalez standing outside pushing the metal security door closed, while it was being pushed open from the inside. Gonzalez reached his hand around the door to the inside. Banks reached his left hand outside and fired a shot at Gonzalez. As Gonzalez fell backwards, Banks stepped from behind the door and fired three or four shots at Gonzalez. The last shot fired by Banks hit Gonzalez in the head. Banks, David Gardiner, and Brandon Daniels, ran northbound on La Brea Avenue and then eastbound on 8th Street. Hustead described Banks as the tallest of the three men. He wore a brown shirt, a baseball cap and had facial hair.

At approximately 3:45 p.m., Robert Simmons was driving southbound on La Brea Avenue just south of 8th Street when he heard some popping sounds. Simmons slowed down and looked to his left where he saw two men pushing back and forth on a door. Both men had guns and were trying to reach around the door to shoot at each other.

---

[3]    Banks's companions were later identified as David Gardiner, arrested in July 2009, and Brandon Daniels, arrested in March 2010. They are not parties to this appeal.

Simmons saw Banks's profile when he was directly across from him. Banks was wearing a jacket, jeans, and some form of head wrap. Simmons pulled over to the side. He looked back and saw Gonzalez lying on the sidewalk.

Petar Todorovic was in his apartment on South Sycamore Avenue, which was one block east of and parallel to La Brea Avenue, when he heard gunshots. He saw Banks and Gardiner run into a driveway by his building where they stopped briefly and spoke to each other. Todorovic described Banks as having a beard, wearing a hat and a brown shirt. Gardiner was short and wore cornrows. Banks then jumped over a fence and continued to run eastbound. Gardiner waited a few seconds and then ran southbound on South Sycamore Avenue.

Dominic Agbabiaka was standing on the sidewalk on South Sycamore Avenue about the middle of the block between 8th and 9th Streets. Daniels, who was running southbound on South Sycamore Avenue, crossed the street and asked Agbabiaka if he could use the restroom inside the house. Daniels appeared excited and nervous. Agbabiaka refused and Daniels stayed there for a moment "looking blank like he was confused." A gray Ford Expedition (SUV) came around the corner from 9th Street. The SUV had paper license plates that had the word "Power" on them, and was travelling fast for a residential street. As the SUV approached, Daniels screamed "Troy, Troy." The SUV slowed down but did not completely stop. Gardiner ran across the street and he and Daniels jumped inside the SUV. The SUV sped off and turned eastbound on 8th Street.

### *Police Investigation*

At approximately 3:50 p.m., Los Angeles Police Department (LAPD) Sergeant Elizabeth Ellis and Officer Gregory Whorton responded separately to a robbery in progress call at La Brea Collective. Gonzalez was lying on the sidewalk. Officer Ellis recovered a revolver with the hammer cocked that was on the ground near Gonzalez's outstretched arm.

Police officers set up a perimeter around the area within minutes of the shooting and Officer Whorton was directed to a location near 8th Street and South Orange Drive,

5

less than two blocks from the dispensary. Banks was walking northbound on South Orange Drive and was detained by Officer Whorton. He had a beard and was wearing a tan shirt and a baseball cap. Later that afternoon, LAPD Officer Keith Gonzales and his partner were at South Mansfield Avenue and 8th Street, one block east of South Orange Drive, when an SUV with "Power" license plates drove by. Officer Gonzales followed the SUV and made a traffic stop a few blocks away. Matthews was the only occupant of the vehicle and was taken into custody. The SUV was registered to Banks and another person, and clothing belonging to Banks was found inside.

LAPD Detective John Shafia arrived after Sergeant Ellis and found a single black glove and bullet casings on the sidewalk. There were bullet holes in the walls, windows, and doorjamb. Inside the lobby, Detective Shafia found two zip ties connected together, and 10 shell casings ejected from a nine-millimeter automatic weapon. A bullet fragment was recovered from inside the dispensary, and additional bullet fragments were recovered from a store next door and from a business located across the street. There were surveillance cameras throughout the building but the recording equipment was unable to play any video depicting the incident.

Later that day, Chavero identified Banks at a field show up as one of the robbers who had a gun. He told the police that Banks had worn either one glove or a pair of gloves. Chavero also identified Banks in court as one of the assailants at the dispensary. Chavero did not see the face of the other robbers but said one of them had cornrows. Both Simmons and Hustead identified Banks at a field show up and in court as the person who fired shots at Gonzalez. Agbabiaka identified Daniels as the individual who asked to use the restroom, and he also identified the SUV as the vehicle Daniels and Gardiner got into on South Sycamore Avenue.

Gonzalez sustained a fatal gunshot wound to his left temple and a second potentially fatal gunshot wound to his left shoulder. A bullet fragment was removed from Gonzalez's shoulder during the autopsy and booked into evidence.

6

On October 2, 2008, LAPD Officer Javier Hernandez found a photocopy of a physician's statement and recommendation form for medical marijuana use. The document was by the door of the lobby area of the dispensary. The bottom of the statement contained a photocopy of a driver's license with a photograph of Banks.

Over the next couple of days Detective Shafia went through the area near the dispensary believed to be the escape route. He interviewed neighbors and went through the yards. On October 7, 2008, LAPD Detective Kurt Wong and a team of police officers searched the area near the dispensary. Detective Wong found some black plastic zip ties, a semiautomatic handgun, a gun holster, and gloves in the bushes near the front porch of a house on South Orange Drive.

### *Forensic Evidence*

#### DNA

Detective Shafia obtained DNA samples from Banks, Matthews, Gardiner, and Daniels and sent them to the DNA laboratory for analysis. Lindsey Murray, a DNA analyst with Bode Technology, testified that Banks's DNA profile matched the DNA from the pair of gloves recovered from the bushes on South Orange Drive. The statistical analysis of the likelihood that Banks was a major contributor was one in 83 quintillion in the African-American population. The DNA from the two zip ties found at the dispensary matched Gardiner. Gardiner was also the major contributor to the DNA sample taken from the glove found at the dispensary.

#### Fingerprints

Larry Peelen, a forensic print specialist with the LAPD, examined latent fingerprints that were obtained from the physician's statement found inside the dispensary. Peelen testified that one of the prints lifted from the back of the physician's statement was Banks's print. A print taken from the inside of the front metal security door matched a left palm print obtained from Daniels.

7

**Ballistics**

LAPD criminalist Fadil Biraimah conducted testing on the revolver, the expended casings found at the crime scene, and the semiautomatic handgun recovered from the bushes near the dispensary. The semiautomatic handgun was a nine-millimeter Glock, and Biraimah testified it was the weapon that fired the casings found at the dispensary.

**Cell Phone and Global Positioning Satellite (GPS)**

Detective Shafia recovered a black Motorola cell phone from Banks and a red T-Mobile cell phone from Matthews. Cell phone records pertaining to the date of the offense were obtained for both cell phones. Eric Tyrell, a custodian of records working for Sprint Nextel, provided testimony regarding the records for the cell phone recovered from Matthews. On October 1, 2008, Matthews made six outbound calls to the phone recovered from appellant Banks. The first call was at 2:53 p.m. and lasted 24 seconds. The second call was at 3:46 p.m. and lasted 32 seconds. The third call was at 3:49 p.m. and lasted 49 seconds. The fourth call was at 3:51 p.m. and lasted 48 seconds. The fifth was made at 3:53 p.m. and lasted 31 seconds, and the sixth and last call was made at 3:56 p.m. and lasted 37 seconds. Matthews received three incoming calls from Banks. The first call was at 1:49 p.m. and lasted 19 seconds. The second call was at 3:44 p.m. and lasted 20 seconds, and the third call was at 3:58 p.m. and lasted 20 seconds. None of the incoming calls to Matthews's cell phone were sent to a voice mail.

The parties stipulated that Matthews was wearing a GPS device on the date of the incident which was unique to him and tracked his movement. The device captured his location by latitude and longitude within 15 meters of the exact location. Daniel Ramirez, an expert in GPS systems, testified as to Matthews's movements. On October 1, 2008, at approximately 2:51 p.m., Matthews was at the intersection of La Brea and 8th Street (near the dispensary). At 3:00 p.m., the GPS showed Matthews at South Mansfield Avenue, three blocks from the dispensary, where he remained for approximately 45 minutes. At 3:46 p.m., Matthews traveled from South Mansfield Avenue to 9th Street, then proceeded north on South Sycamore Avenue, and onto

8

8th Street. The GPS showed Matthews made a number of other stops at various locations within a few blocks of the dispensary.

### Gang Evidence

LAPD Officer James Moon testified as a gang expert. He received general gang training at the academy. He worked patrol where he came in contact with gang members and was familiar with "gang dress, gang paraphernalia, gang tattoos, their territories, . . . their rivals, who they get along with, graffiti, the specific type of gang crimes, gang motives." He was familiar with the Rollin 30's Harlem Crips (Rollin 30's) and provided training for the Los Angeles County Sheriff's Department regarding that particular gang. There were approximately 750 members of the Rollin 30's gang. Their primary criminal activities included narcotics sales, burglaries, robberies, shootings, attempted murders, murders, and gun possession. Officer Moon testified to the commission of two predicate crimes committed by members of the Rollin 30's. Yuhri Duddly was convicted of possession of a firearm by a felon in 2007, and Jerry Tyronne Phillips was convicted of possession of a concealed weapon in 2007. Officer Moon was personally familiar with both Duddly and Phillips and both admitted to him that they were members of the Rollin 30's gang.

Members of the Rollin 30's wore blue or brown clothing because they were members of the Crips. They also had common tattoos on their bodies consisting of the numbers three and zero, the word "Harlem," and the letters "DG," which stand for Dirt Gang, a nickname for the Rollin 30's gang.

Officer Moon opined that Matthews was a member of the Rollin 30's based on several factors. First, Matthews had the word "Harlem" tattooed on his chest. Second, LAPD Officer Severns informed Officer Moon that he stopped Matthews on December 15, 2004. During that stop, Matthews, who used the moniker "Big Boy,"[4]

---

[4] Matthews was also known by the moniker "Troy," which was his middle name. Officer Moon testified that it was common for gang members to claim one moniker when talking to police and another when talking to fellow gang members.

9

self-admitted his gang affiliation with the Rollin 30's. Third, Matthews self-admitted being a member of the Rollin 30's on two separate occasions in 2004 and 2007 to Officer Moon's former partner, LAPD Officer Zavala. Finally, Matthews lived within the territory claimed by the Rollin 30's.

Officer Moon opined that Gardiner was also a member of the Rollin 30's and belonged to the 37th Street clique, with the moniker "Little Bronx." His opinion was based on Gardiner's gang tattoos, which included a "DGCC" tattoo on his neck signifying the "Dirt Gang Crip," a "Rich Rollin 30's" tattoo on his forearm, and a "37th Street" tattoo under his right eye. Officer Moon also testified that he saw photographs of Gardiner flashing gang signs affiliated with the Rollin 30's.

Officer Moon based his opinion that Daniels was a member of the Rollin 30's on a number of factors. Daniels admitted to being a member of the Rollin 30's during numerous contacts with LAPD officers Gingras, Marshall, and Zavala. He sported a number of tattoos including a "Harlem Love" tattoo on his chest and a "37" on his left arm, which indicated his particular clique within the Rollin 30's. He also had an "OHC" tattoo on his abdomen, which Officer Moon testified stood for Original Harlem Crips. Daniels went by the moniker "Big Bronx" and a 2006 police report indicated that Daniels etched the Rollin 30's name and his moniker on a metal door.

Responding to a hypothetical question based on the facts of this case, Officer Moon opined that the crimes were committed in association with the Rollin 30's criminal street gang because there were several individuals from the same gang working together in the commission of the crime, and a Rollin 30's gang member would not have committed the crime with a nongang member. Money gained from the robbery would be distributed among the gang members and also used within the community to recruit new gang members. Each gang member was expected to put in work for the gang, and the robbery also benefitted the gang and instilled fear in the community by showing the gang was active and willing to commit violent crimes. Officer Moon described how the gang culture involved respect and how gangs achieved their power through fear and

10

intimidation.  The dispensary was not within the Rollin 30's territory but it was common for gang members to go into other areas to commit assaults and shootings to claim new territory.

**Banks's Defense Case[5]**

Banks challenged the prosecution's identification evidence by presenting testimony by an eyewitness identification expert.  Robert Shomer, Ph.D., described the various factors that reduce the accuracy of an identification, including life-threatening, unexpected and traumatic circumstances, age and racial differences between the eyewitness and the perpetrator, the manner in which the identification procedure is conducted, and the precision of the eyewitness's initial description.  According to Dr. Shomer, the more stressors present the more difficult it is to later identify a person. He opined that a field show up was inherently suggestive and witnesses often believed they were confirming the police officer's choice.

Banks also presented testimony from an eyewitness to the shooting.  On October 1, 2008, Juan Renteria was working at the Firestone Tire Center adjacent to the dispensary.  He heard a sound that resembled a backfire and walked towards the sidewalk.  He saw a gunman, who was approximately 5 feet 4 inches tall with curly hair, shoot Gonzales.  He did not get a good look at the other two men.  He stated that Banks was not one of the men he saw that day.

## DISCUSSION[6]

### I.     Bifurcation of Gang Enhancement

Appellants contend the trial court abused its discretion by refusing to bifurcate the gang enhancement from the trial of the substantive offenses.

---

**5**     Matthews did not present any evidence on his own behalf.

**6**     Both Banks and Matthews join arguments of the other to the extent they may inure to their benefit (Cal. Rules of Court, rule 8.200(a)(5)).  We discuss each argument in reference to the appellant asserting it.

### A.    *Background*

At the preliminary hearing, LAPD Officer Brian Zavala testified as a gang expert. Officer Zavala testified that Matthews, along with Daniels and Gardiner, belonged to the Rollin 30's gang and that Banks belonged to the Rollin 60's gang. Prior to trial, Banks moved to bifurcate the trial on the gang allegation. Matthews joined. Appellants argued the introduction of gang evidence was prejudicial and had no relevance to guilt on the underlying charges and served only to sway the jury to convict. The prosecutor argued the gang evidence was relevant to show that the primary activities of appellants' gangs established motive, and that gang members committed crimes with each other. It was also relevant to show that Matthews had knowledge of the plan to commit the robbery because he belonged to the same gang as Daniels and Gardiner. The court stated it had read the entire preliminary hearing transcript and noted the prosecution intended to use a different gang expert at trial. The prosecution stated it anticipated Officer Moon's testimony would be "very similar" to Officer Zavala's and would "coincide with [the prosecution's] theory of the case that was presented at the preliminary hearing as to the gang allegation."

The court denied the motion. While acknowledging the crime did not have the indicia of gang involvement common to other gang cases, the court believed the gang evidence was probative as circumstantial evidence that Matthews and two of the other perpetrators were members of the same gang. The court also found the gang evidence was probative on the issue of motive which the prosecution was allowed to show. Referring to Officer Zavala's testimony at the preliminary hearing, the court stated "there was testimony that there is a relationship between the Rollin 30's and the Rollin 60's and that they are friendly to each other, that one of the crimes that they carry out is a robbery, . . . how gangs often use crews, people who work together well, to carry out a robbery. So with respect to motives to carry out the robbery, it would be relevant as well as to both Mr. Matthews and Mr. Banks."

The trial court noted that evidence that a defendant is a gang member can be prejudicial, but indicated it would give an instruction limiting the jury's consideration of the evidence. Unlike a drug case where gang evidence is particularly inflammatory, the court stated that the gang evidence here would not be much more inflammatory than the testimony connecting appellants to a murder committed during a robbery.

In its opening statement the prosecution told the jury that a gang expert would testify that one of the primary activities of the Rollin 30's was robbery; that Matthews, Daniels, and Gardiner were members of the Rollin 30's gang; that Banks was not a member of the Rollin 30's gang but a member of the Rollin 60's gang; and, that both gangs "hung out" together and "got along."

Before the gang expert testified, the court held an Evidence Code section 402 hearing regarding Officer Moon's testimony as a gang expert. The court issued a number of rulings with regard to the scope of Officer Moon's testimony. The court found that Officer Moon had "sufficient background, training and expertise and experience with respect to the Rollin 30's to testify as a gang expert." While the court found that Officer Moon had the necessary experience to testify regarding the relationship between the Rollin 30's and the Rollin 60's, he could not testify as an expert on the Rollin 60's, nor could he opine that Banks was a member of the Rollin 60's.

## B. Standard of Review

The denial of a motion to bifurcate the trial of a gang enhancement is reviewed for abuse of discretion. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1050.) In a case with allegations pursuant to the gang benefit enhancement statute, a unitary trial is permitted even if the evidence offered to prove the enhancement might be ruled inadmissible at trial of the substantive crime itself, for example, if some of it might be excluded under Evidence Code section 352 as unduly prejudicial. (*People v. Hernandez, supra,* at p. 1050.) In this context, a trial court abuses discretion when the denial of bifurcation "would pose a substantial risk of undue prejudice to the defendant." (See *People v.*

13

*Calderon* (1994) 9 Cal.4th 69, 77, 78 [prior conviction allegations]; *People v. Hernandez, supra,* at pp. 1048–1050.)

### C. Analysis

In this case, the gang evidence was intertwined with the substantive offenses. The gang evidence was relevant to show motive for the substantive crime of robbery during which the murder occurred. Moreover, the concept of "undue prejudice" within the meaning of Evidence Code section 352 is not so sweeping as to include any evidence the opponent finds inconvenient. Evidence is not prejudicial under section 352 merely because it undermines the opponent's position or shores up that of the proponent. (*People v. Branch* (2001) 91 Cal.App.4th 274, 286.)

Evidence that criminal street gangs, such as the Rollin 30's, benefit from robberies committed by gang members so they could recruit other gang members and work together for the benefit of the gang, was highly probative on the issue of motive and not unduly prejudicial. With respect to Matthews, the evidence was also probative on the issue of identity to show Matthews was participating in a crime with two fellow gang members; explained why he was driving Banks's SUV; and why he picked up Daniels and Gardiner at the scene of the crime.

As to Banks, based on the record before the court at the time the motion was made, the court was entitled to credit the prosecution's position that evidence would be presented to show that Banks was a member of the Rollin 60's, a gang that was known to work together with the Rollin 30's, thereby establishing Bank's identity and intent as a participant in the underlying offenses. It is not determinative that evidence was not presented to the jury as to Banks's gang membership. (*People v. Romo* (1975) 47 Cal.App.3d 976, 984–985, disapproved on another point in *People v. Bolton* (1979) 23 Cal.3d 208, 213–214 [the existence of abuse of discretion in denying a motion to sever must be determined as of the showing when the motion is made, and not by later revealed circumstances].)

The court denied a pretrial motion for separate trials, ruling the trial of appellants Banks and Matthews was appropriately joined. As the evidence was properly admitted to establish Matthews's guilt of the charged crimes, it was, therefore, appropriate to introduce it during the joint trial. The evidence showed that Banks associated with dangerous and violent men because Matthews was driving a vehicle registered to Banks. Therefore, the evidence that the three other participants in the robbery and murder were gang members did not have a strong tendency to bias the jury against Banks. Furthermore, prior to Officer Moon's testimony, the jury was instructed that the gang evidence could be considered only for the limited purpose of determining whether the defendants acted with the intent, purpose, and knowledge that was required to prove the charged gang enhancement. We see nothing in the record to suggest that the jury considered the gang evidence for an improper purpose, and we presume the jury followed the limiting instruction. (See *People v. Waidla* (2000) 22 Cal.4th 690, 725.)

We reject Banks's contention that the "sheer volume of gang evidence was grossly disproportionate to its relevance and purpose." Officer Moon's testimony regarding gang culture was necessary to provide the jury with information explaining why gang members commit crimes together and outside their gang territory. According to our review of the transcripts, the prosecution's questions were direct and Officer Moon's responses were factual and succinct.[7] Again we note that Officer Moon followed the court's rulings regarding the scope of his testimony and focused solely on the Rollin 30's and the involvement of Matthews, Daniels, and Gardiner. There was no testimony regarding the activities of the Rollin 60's or Banks's gang membership.

## II. Substantial Evidence Supports Appellant Matthews's Convictions

Appellant Matthews contends the evidence was insufficient to sustain the convictions. Specifically, he argues that he did not know Banks, Gardiner, and Daniels

---

[7] Banks points out that Officer Moon's testimony comprised over 100 pages of reporter's transcript. Officer Moon's direct testimony consumed less pages of transcript than the cross-examination by defense counsel.

15

were going to commit a robbery and that the evidence establishes that he was an accessory after the fact. We disagree.

When an appellant challenges the sufficiency of the evidence to support a conviction, "we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) We "'"presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."'" (*People v. Davis* (1995) 10 Cal.4th 463, 509.) We draw all reasonable inferences in support of the judgment. (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1237.) "An inference is not reasonable if it is based only on speculation." (*People v. Holt* (1997) 15 Cal.4th 619, 669.)

The same standard applies when the conviction rests primarily on circumstantial evidence. (*People v. Perez* (1992) 2 Cal.4th 1117, 1124.) Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. (*Ibid.*) "'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. [Citation.]'" (*People v. Thomas* (1992) 2 Cal.4th 489, 514.) Applying this standard, appellant Matthews's argument fails to persuade us that reversal of the convictions is warranted.

### A. *Attempted Robbery and Burglary Under Aiding and Abetting Theory*

#### 1. Relevant Authority

A person aids and abets a crime when he or she commits, encourages or facilitates its commission with knowledge of the unlawful purpose of the perpetrator and the intent or purpose of committing, encouraging, or facilitating the offense. (*People v. Beeman* (1984) 35 Cal.3d 547, 560–561.) No particular factor is dispositive in establishing

16

knowledge and intent; the court must look at the totality of the circumstances. (*People v. Medina* (2009) 46 Cal.4th 913, 922.) "Among the factors which may be considered . . . are: presence at the scene of the crime, companionship, and conduct before and after the offense." (*In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1094; see also *In re Juan G.* (2003) 112 Cal.App.4th 1, 5.)

"Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) An attempted robbery requires the specific intent to commit robbery and a direct yet ineffectual act that went beyond mere preparation toward its commission. (*People v. Lindberg* (2008) 45 Cal.4th 1, 24.) A defendant's intent is rarely susceptible of direct proof and may be inferred from the facts and circumstances surrounding the offense. (*People v. Ramos* (2004) 121 Cal.App.4th 1194, 1207–1208.)

Section 459 provides that, "[e]very person who enters any house, room, apartment, tenement, shop, warehouse, store, mill, barn, stable, outhouse or other building, tent, vessel, . . . with intent to commit grand or petit larceny or any felony is guilty of burglary." Thus, "the substantive crime of burglary is defined by its elements as: (1) entry into a structure, (2) with the intent to commit theft or any felony." (*People v. Anderson* (2009) 47 Cal.4th 92, 101.) The crime is complete when the defendant enters one of the statutorily specified premises with the intent to steal something or commit any felony; a burglary can be committed without an actual taking of property. (*People v. Magallanes* (2009) 173 Cal.App.4th 529, 535–536.)

If a defendant's liability for an offense is predicated upon the theory that he or she aided and abetted the perpetrator, the defendant's intent to encourage or facilitate the actions of the perpetrator "must be formed *prior to or during* 'commission' of that offense." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164.)

### 2. Analysis

We reject Matthews's contention that the evidence supports a conviction only for accessory after the fact. Matthews minimizes his involvement and argues that the

individual acts of driving Banks, Daniels and Gardiner to the dispensary and then waiting approximately 45 minutes, is not evidence that Matthews shared their criminal intent, and the attempted robbery and burglary were complete by the time he helped Daniels and Gardiner escape.

But, substantial evidence permitted a reasonable inference that Matthews acted with the intent to facilitate the actions of Banks, Gardiner, and Daniels, prior to, during, and after the commission of the attempted robbery and burglary of the dispensary. Matthews's theory requires us to ignore the significance of the following facts. Matthews received a call on his cell phone from Banks at 1:49 p.m. on the day in question. At 2:51 p.m., while driving an SUV registered to Banks, a GPS tracking device placed him at the intersection of 8th Street and La Brea, in the immediate vicinity of the dispensary. Matthews then drove three blocks and parked on South Mansfield Avenue. At 2:53 p.m. he placed a call to Banks's cell phone. Matthews remained parked three blocks from the dispensary for approximately 45 minutes. Around the same time witnesses reported the shooting at the dispensary,[8] two more cell phone calls occurred between Matthews and Banks. Matthews then drove the SUV to South Sycamore Avenue, one block from the dispensary, where Gardiner and Daniels were waiting for him. Daniels yelled "Troy, Troy," which was Matthews's moniker and also his middle name. Matthews slowed down allowing Daniels and Gardiner to get into the SUV before he sped off. Five more calls in rapid succession took place between Matthews and Banks prior to Banks being arrested within blocks of the dispensary. When Matthews was arrested later that same day, he was still driving the SUV registered to Banks.

The jury was instructed that if two reasonable conclusions arise from circumstantial evidence, it must accept the conclusion that points to innocence. But the jury was also instructed that it must accept only reasonable conclusions and reject any

---

[8]    Todorovic, who lived one block from the dispensary, heard gunshots; Simmons saw Banks shoot Gonzalez at approximately 3:45 p.m.; and, police officers responded at approximately 3:50 p.m. to the crime scene.

that are unreasonable. While we may speculate about any number of scenarios that may have occurred on the day in question, a finding of fact must be based on an inference drawn from the evidence. (*People v. Morris* (1988) 46 Cal.3d 1, 21, disapproved on other grounds in *In re Sassounian* (1995) 9 Cal.4th 535, 543–544, fn. 5.)

Based on the foregoing evidence, a jury could reasonably conclude that Matthews discussed the robbery and burglary prior to driving to the dispensary and acted as the getaway driver. Therefore, Matthews formed the intent to help Banks, Daniels, and Gardiner get away before cessation of the acts constituting the felonies, which constituted aiding and abetting. (*In re Malcom M.* (2007) 147 Cal.App.4th 157, 171.)

### B.  First Degree Felony Murder

### 1.  Relevant Authority

"In California, the first degree felony-murder rule 'is a creature of statute.' [Citation.] When the prosecution establishes that a defendant killed while committing one of the felonies section 189 lists, 'by operation of the statute the killing is deemed to be first degree murder as a matter of law.'" (*People v. Mendoza* (2000) 23 Cal.4th 896, 908.) Pursuant to Section 189, the list of felonies includes attempted robbery and burglary. "With respect to any homicide resulting from the commission of or attempt to commit one of the *felonies* listed in the statute, our decisions generally hold section 189 to be not only a degree-fixing device but also a codification of the felony-murder rule: no independent proof of malice is required in such cases, and by operation of the statute the killing is deemed to be first degree murder as a matter of law." (*People v. Dillon* (1983) 34 Cal.3d 441, 465.)

"'All persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, . . . are principals in any crime so committed.' (§ 31.) Accordingly, an aider and abettor 'shares the guilt of the actual perpetrator.'" (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1122.) As such, all persons aiding and abetting the commission of an attempted robbery are guilty of first degree murder "when one of them kills while acting in furtherance of the

19

common design." (*People v. Washington* (1965) 62 Cal.2d 777, 782; §§ 31, 189; *People v. Dillon, supra,* 34 Cal.3d at p. 465.)

Conviction as an aider and abettor requires a showing that the defendant acted with "*knowledge* of the perpetrator's criminal purpose and the *intent or purpose* of committing, encouraging, or facilitating the commission of the target offense." (*People v. Mendoza, supra,* 18 Cal.4th at pp. 1118, 1123.) "'The logical basis for conviction as an aider and abettor is that with knowledge of the unlawfulness of the act, one renders some independent contribution to the commission of the crime or otherwise makes it more probable that the crime will be successfully completed than would be the case absent such participation. [Citation.]'" (*People v. Markus* (1978) 82 Cal.App.3d 477, 481.)

### 2. Analysis

Matthews contends the evidence was legally insufficient to prove he aided and abetted the commission of felony murder. However, as discussed above, the record contained reasonable, credible and solid evidence to support the jury's finding that Matthews knowingly aided and abetted Banks, Gardiner, and Daniels before the attempted robbery and burglary of the dispensary began, and that an accomplice of Matthews killed Gonzalez in the commission of the attempted robbery.

Additionally, under the escape rule, the crimes of attempted robbery and homicide were ongoing because Daniels and Gardiner were "in flight" and had not reached a "place of temporary safety" when they ran to the next block and waited for Matthews to pick them up. (*People v. Cavitt* (2004) 33 Cal.4th 187, 208.) The police were on the scene and setting up a perimeter within moments of the shooting, therefore Daniels and Gardiner had not effected an escape until assisted by Matthews.

### C. *Special Circumstance Finding*

#### 1. Relevant Authority

A felony-murder special circumstance is applicable to a defendant who is not the actual killer if the defendant, either with the "intent to kill" (§ 190.2, subd. (c)), or "with

20

reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated in paragraph (17) of subdivision (a) which results in the death of some person or persons." (§ 190.2, subd. (d).) "'[R]eckless indifference to human life,'" as used in this context, means "subjective awareness of the grave risk to human life created by his or her participation in the underlying felony." (*People v. Estrada* (1995) 11 Cal.4th 568, 578.)

### 2. Analysis

Matthews argues that he was not a major participant and did not act with the requisite reckless indifference to human life. As established in part II.*A.*, *ante*, we believe the evidence was sufficient to show that the jury found that Matthews aided and abetted the attempted robbery and burglary prior to Gonzalez's death to sustain his first degree murder conviction. Matthews did not play a "minor role," as he asserts, but was a major participant in the crimes. Matthews drove Banks's car to the location, parked a few blocks away and waited for the signal to pick up his fellow perpetrators. He had a "'notable or conspicuous'" role in the commission of the underlying felonies. (*People v. Proby* (1998) 60 Cal.App.4th 922, 930–931.)

With advance knowledge of the planned robbery and burglary, Matthews had to be aware of the risk of resistance and the extreme likelihood that death could result. Banks, Daniels, and Gardiner anticipated as much because they were armed. Evidence was introduced at trial that Matthews belonged to the Rollin 30's—as did Daniels and Gardiner. This was a gang with a history of violence and was known for possessing guns and committing robberies, shootings, and murders.

Contrary to Matthews's assertion, the prosecution did not have to show that Matthews acted with an intent to kill. In *Tapia v. Superior Court* (1991) 53 Cal.3d 282, the Supreme Court explained that subdivision (d) of section 190.2 is the result of Proposition 115, the "Crime Victims Justice Reform Act," effective June 6, 1990. (*Tapia v. Superior Court, supra,* at pp. 286, 297–298.) Prior to the adoption of this provision, in

21

order for a felony-murder special-circumstance allegation to be found true as to a defendant who was "an aider and abetter rather than the actual killer, intent [to kill] must be proved." (*People v. Anderson* (1987) 43 Cal.3d 1104, 1147.) Proposition 115 eliminated the requirement of intent to kill as an element of the felony-murder special circumstance with respect to an aider and abettor. As a result, a defendant found guilty of felony murder but who is not the actual killer may be subjected to capital punishment or life in prison without possibility of parole in accordance with subdivision (d) of section 190.2 "which provides that an accomplice, for a felony-murder special circumstance to be found true, must have been a major participant [in the underlying felony] and have acted with reckless indifference to human life . . . ." (*Tapia v. Superior Court, supra,* at p. 298.) Subdivision (d) of section 190.2 "brings state law into conformity with *Tison v. Arizona* (1987) 481 U.S. 137, 158, and, thus, changes state law to the detriment of defendants." (*Tapia v. Superior Court, supra,* at p. 298, fn. 16.)

Matthews analogizes his situation to that of the defendant in *Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*), but his reliance is misplaced. In that case, two persons robbed and killed an elderly couple at their farmhouse. Enmund was the getaway driver and, at the time of the crimes, was sitting in a car some 200 yards away. (*Id.* at pp. 783–786.) In reversing Enmund's death sentence, the United States Supreme Court stated: "The question before us is not the disproportionality of death as a penalty for murder, but rather the validity of capital punishment for Enmund's own conduct. The focus must be on *his* culpability, not on that of those who committed the robbery and shot the victims, for we insist on 'individualized consideration as a constitutional requirement in imposing the death sentence,' [citation], which means that we must focus on 'relevant facets of the character and record of the individual offender.' [Citation.]" (*Id.* at p. 798.)

*Enmund* does not assist Matthews. First, it concerns the proportionality of a sentence of death. Matthews received a sentence of life without the possibility of parole. Moreover, *Enmund* predates the United States Supreme Court's decision in *Tison v. Arizona* (1987) 481 U.S. 137, in which the high court concluded *Enmund* did not

22

preclude imposition of the death penalty on those who, while not the actual killers, were found to have been major participants and to have acted with reckless indifference to human life. (*Tison, supra,* at p. 158.)

### D. *Gang Enhancement*

#### 1. Contentions

Matthews contends the gang enhancement was not supported by substantial evidence. He argues that there was no evidence the crimes were "gang-related," or that he committed them "with the specific intent to aid gang members, as opposed to committing the crimes for personal reasons unrelated to a gang."

#### 2. Relevant Authority

A gang enhancement finding is reviewed under the substantial evidence standard. (*People v. Ochoa* (2009) 179 Cal.App.4th 650, 657 (*Ochoa*).) To establish a gang enhancement, the prosecution must prove two elements: (1) that the crime was "committed for the benefit of, at the direction of, or in association with any criminal street gang," and (2) that the defendant had "the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(1).) The crime must be "'gang related.'" (*People v. Gardeley* (1996) 14 Cal.4th 605, 622, 625, fn. 12; *People v. Castaneda* (2000) 23 Cal.4th 743, 745 [gang enhancement statute "increases the punishment for some gang-related crimes"]; *People v. Mendez* (2010) 188 Cal.App.4th 47, 56 [gang enhancement statute "applies when a crime is gang related"].) A defendant's mere membership in the gang does not suffice to establish the gang enhancement. (*People v. Gardeley, supra*, at pp. 623–624.) Rather, "'[t]he crime itself must have some connection with the activities of a gang.'" (*In re Frank S*. (2006) 141 Cal.App.4th 1192, 1199.) "[T]o prove the elements of the criminal street gang enhancement, the prosecution may, as in this case, present expert testimony on criminal street gangs. [Citation.]" (*People v. Hernandez, supra,* 33 Cal.4th at pp. 1047–1048.)

23

### 3. Analysis

The first element of the gang enhancement may be satisfied by showing any one of the following—the crime was committed for the benefit of, at the direction of, *or* in association with a criminal street gang. (§ 186.22, subd. (b)(1).) In this case, there was sufficient evidence to show these crimes were committed in association with a criminal street gang.

Active participation is defined as "involvement with a criminal street gang that is more than nominal or passive." (*People v. Castaneda, supra,* 23 Cal.4th at p. 747.) It does not require that "a person devot[e] 'all, or a substantial part of his time and efforts' to the gang. [Citation.]" (*Id.* at p. 752.) Evidence establishing that the crime was committed with another gang member will support a finding that it was committed in association with a gang. (*Ochoa, supra*, 179 Cal.App.4th at p. 661.)

The facts are undisputed that both Daniels and Gardiner, along with Matthews, are self-admitted members of the Rollin 30's gang and sport tattoos signifying their loyalty to the gang. Matthews was known as "Big Boy" or "Troy." Daniels's moniker was "Big Bronx," and he and Gardiner, who went by the moniker "Little Bronx," were seen together and stopped by police officers on two separate occasions. Gardiner's DNA was found on the zip ties inside the dispensary and Daniels's prints were found on the metal security door. Eyewitnesses identified the SUV driven by Matthews as the vehicle that picked up Daniels and Gardiner on South Orange Drive, within moments of the robbery and shooting. Here, the jury could reasonably infer the requisite association from the very fact that Matthews committed the charged crimes in association with Daniels and Gardiner. (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1198.)

With respect to the second element, sufficient evidence established that appellants acted with "the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd.(b)(1).) Because substantial evidence supports a finding that the crimes benefitted the gang, reversal cannot be justified by the possibility

that the evidence might have been reconciled with a finding that appellants acted only for personal reasons. (See *People v. Albillar* (2010) 51 Cal.4th 47, 60.)

Robbery was one of Rollin 30's primary activities and Officer Moon testified that the crime would benefit the gang in a number of ways. The community in which the gang members lived and where the crimes took place would be intimidated because it would show the gang was active. The money gained from the robbery would be distributed among the gang and also used to recruit new gang members. We reject Matthews's contention that Officer Moon's testimony does not constitute substantial evidence. Before Officer Moon testified, the court held an Evidence Code section 402 hearing and found that Officer Moon had "sufficient background, training and expertise and experience with respect to the Rollin 30's to testify as a gang expert." A jury may rely on expert testimony to reach a verdict on a gang-related offense or a finding on a gang allegation. (*People v. Ferraez* (2003) 112 Cal.App.4th 925, 930 [expert testimony that drug offense was gang-related plus evidence that defendant received permission to sell drugs at a mall from a gang and admission of gang membership constituted circumstantial evidence that defendant intended to benefit the gang].)

III.   **Instructional Error—CALCRIM No. 1603**

Matthews contends the trial court committed prejudicial instructional error requiring reversal. The court instructed the jury with CALCRIM No. 1603—the jury instruction on aiding and abetting a robbery. He argues the court should have instructed the jury on the duration of an attempted robbery for purposes of assessing aider and abettor liability. He contends the error violated his due process rights because it reduced the prosecution's burden of proof. The People argue that even if we assume the instruction was erroneous such that the trial court erred in its instruction to the jury, such error was harmless when viewing the jury instructions as a whole.

The trial court read jury instructions on aiding and abetting, including CALCRIM No. 1603, which states: "To be guilty of robbery as an aider and abettor, the defendant must have formed the intent to aid and abet the commission of the robbery before or

25

while a perpetrator carried away the property to a place of temporary safety.  [¶]  A perpetrator has reached a place of temporary safety with the property if he or she has successfully escaped from the scene, is no longer being pursued, and has unchallenged possession of the property.”

We do not view CALCRIM No. 1603 in isolation.  “We consider the instructions as a whole and assume the jurors are intelligent persons capable of understanding and correlating all the instructions.  [Citation.]”  (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1332.)  Here, the court instructed the jury on aiding and abetting (CALCRIM No. 401), attempt (CALCRIM No. 460), first degree murder under a theory of felony murder (CALCRIM No. 540A), and nonkiller liability under a theory of felony murder (CALCRIM No. 540B).  In addition, the jury was given CALCRIM No. 730, while specifically directed to the attempted robbery-murder special circumstance allegation, contained the following modified language:  “*The defendant must have intended to commit or aided and abetted the felonies of burglary or attempted robbery before or at the time of the act causing the death.*”  (Italics added.)  The italicized passage from modified CALCRIM No. 730 was in substance, if not in precise terms, the pinpoint instruction that Matthews argues should have been given to the jury.

Matthews argues the error in giving CALCRIM No. 1603 is reviewed under the *Chapman v. California* (1967) 386 U.S. 18 “beyond a reasonable doubt” prejudicial error standard because that instruction “underscored the prosecution’s theory of complicity” and contributed to the verdict obtained in the case.

We will assume, for purposes of argument, that Matthews is correct.  When the jury is “misinstructed on an element of the offense . . . reversal . . . is required unless we are able to conclude that the error was harmless beyond a reasonable doubt.”  (*People v. Hayes* (1990) 52 Cal.3d 577, 628.)  “In deciding whether a trial court’s misinstruction on an element of an offense is prejudicial to the defendant, we ask whether it appears “‘“‘beyond a reasonable doubt that the error complained of did not contribute to the

26

verdict obtained.'"'"  (*People v. Hudson* (2006) 38 Cal.4th 1002, 1013, quoting *People v. Hagen* (1998) 19 Cal.4th 652, 671.)

Matthews argues the escape rule does not apply to attempted robbery and because the prosecution relied "*most heavily* on the fact that Matthews helped Gardiner and Daniels *escape*" from the attempted robbery, the jury never considered whether the prosecution "met its burden of proving Matthews's knowledge of the crimes, or specific intent to aid and abet the crimes, *before or during* the commission of the offenses." While the prosecution's argument at trial did address Matthews's role in the escape, it also helped to clarify the law for the jury and the burden the prosecution had to meet. Addressing the issue of Matthews's participation as an aider and abettor, the prosecution argued: "Did Mr. Matthews know when he dropped off these three people they were going to rob the place, three people who went in with guns, the gloves, with zip ties, did he know that. Before or during the commission of the crime, Mr. Matthews intended to aid and abet the perpetrator in committing the crime. That's what—*That's where you look at his actions*, look at what he did in this case, did Mr. Matthews drop off these people, did Mr. Matthews wait around for these people, did Mr. Matthews stay in touch with the people, did he stay in touch with Mr. Banks during the commission of this crime." Trial counsel for Matthews also clarified for the jury what the prosecution had to prove and stated: "Basically what the prosecution has to prove . . . as to Mr. Matthews is that at some point *during* the commission of this offense *or before* the commission of this offense, the robbery, the murder, Mr. Matthews knew what was going to happen, and he also joined in the specific intent, he was of agreement with those who went in that we're gonna do a robbery and we're gonna get proceeds or whatever. Okay? He has to join in that specific intent." "When you look at the items of preparation to try to find support of their theory that Mr. Matthews joined in the intent and knows what was going on, it comes back in his favor. . . . prosecution's theory is that he gets everybody, drives them there, he drops them off." "That's their theory, that he dropped them off with their weapons and their everything."

27

Even if the trial court erred in failing to instruct on this issue, the inquiry we make is whether the guilty verdict actually rendered was "surely unattributable" to the error. (*People v. Esquivel* (1994) 28 Cal.App.4th 1386, 1399, 1400.) Based on the instructions the jury did receive, the arguments of counsel, and the record before us, the verdict was "surely unattributable" to the error in the instructions. Thus, we conclude the error was not prejudicial under the *Chapman* standard, and reversal is unwarranted.

## IV. Denial of Banks's Motion for New Counsel

Banks contends the trial court abused its discretion by refusing to appoint new counsel to investigate his claims regarding ineffective assistance of counsel. Banks contends that he was not given an adequate opportunity to present his claims and the court did not adequately inquire into those complaints. He asserts the trial court "failed to conduct a proper inquiry." Banks is not contending the trial court erred in denying his motion for new trial but requests remand for the purpose of appointing new counsel to investigate and argue his motion for a new trial on the grounds of ineffective assistance of counsel. The basis for Banks's assertion is that the trial court created a conflict of interest by requiring trial counsel to argue he was competent at the *Marsden*[9] hearing and then argue his ineffectiveness in the motion for new trial. Banks's contentions are without merit.

### A. *Procedural Background*

The jury deliberated over four days and on the afternoon of Friday, March 25, 2011, reached a verdict on all counts as to Matthews but indicated it was hung on all counts as to Banks. At a sidebar conference, the trial court informed counsel that it could declare a mistrial as to Banks or send the jury back to deliberate further. Banks's trial counsel suggested the jury be brought back on the following Monday to continue deliberations. The prosecution agreed with the court that further deliberations should

---

[9]    *People v. Marsden* (1970) 2 Cal.3d 118.

resume that afternoon.  The trial court read the *Moore*[10] instruction to the jury that required them to continue their deliberations to see if they could reach a verdict. Following the guilty verdict as to Banks, Banks's trial counsel filed a motion for a new trial which raised among other arguments, a claim of ineffective assistance of counsel based on his failure to object to the trial court's *Moore* instruction.

On July 28, 2011, approximately four months after the verdicts were returned, Banks submitted to the court a handwritten declaration/motion.  The court stated that it did not read the letter because Banks was represented by counsel.  The letter was filed under seal with the court.  On September 16, 2011, the bailiff cleared the courtroom leaving only Banks and his trial counsel to discuss the letter with the court.  The court read the letter and interpreted it as a *Marsden* motion.  The court conducted the *Marsden* hearing prior to proceeding on the motion for new trial.

The court informed Banks that it was not uncommon for a defendant to disagree with his attorney's trial strategy and noted that most of Banks's concerns fell into that category.  Banks agreed with the court's characterization of his arguments.  Banks's trial counsel then responded to the court's inquiries into specific issues raised by Banks concerning his alleged failure to provide effective assistance of counsel.  Counsel stated he visited Banks at the county jail, had conversations with him in lockup, and spoke with him on the telephone.  He filed several pretrial motions and had spent more than one hundred hours preparing the case.  He did not order gunshot residue tests for Banks because gunshot residue dissipates in approximately one hour and he was appointed to the case several weeks after the crime occurred.  There was testimony that the surveillance cameras did not record the incident and counsel did not pursue that issue. He personally reviewed the DNA envelopes and receipts and consulted with a DNA

---

[10]    The charge is referred to in the record as the "depth charge," or "dynamite charge."  It is based on the charge given to the jury under similar circumstances and approved by the appellate court in *People v. Moore* (2002) 96 Cal.App.4th 1105.  In Banks's motion for new trial, counsel refers to the same charge as an "*Allen* charge." (*Allen v. United States* (1896) 164 U.S. 492.)

expert before deciding there was no arguable issue with respect to chain of custody. Counsel stated he made a strategic decision on the issue of the jury resuming deliberations because he thought the jury would not convict Banks. Counsel inquired whether the ineffective assistance of counsel claims raised by Banks established a conflict of interest and asked to be relieved.

After listening to counsel's explanations regarding the issues raised by Banks, the trial court asked Banks if there was anything he wanted to add. Banks stated that his communication with counsel was "pretty good overall" but he did not like the decisions counsel made pertaining to the case. The court first addressed the issues that formed the basis for the *Marsden* motion and stated that counsel had vigorously defended Banks. The trial court cited the exclusion of all evidence that Banks was a gang member as one of the significant rulings counsel obtained. The court found no issues related to the DNA chain of custody or counsel's efforts to locate witnesses. The court commented on counsel's aggressive cross-examination of all witnesses but especially of the eyewitnesses, and the effective closing argument with respect to eyewitness testimony. The fact that the jury did not find true that Banks was the one who personally shot Gonzalez, was the result of counsel's vigorous argument and cross-examination of the witnesses. No one knew when the jury indicated it was deadlocked that the split was in favor of guilty and the court found it was a tactical decision by counsel to have the jury continue deliberations. Finding no breakdown in the relationship between Banks and his counsel, and that counsel had provided Banks with a good defense, the court denied the *Marsden* motion.

The trial court then addressed the specific issue of whether a new attorney should represent Banks to argue the ineffective assistance of counsel in the motion for new trial. The court found that there was either a specific factual reason for counsel's actions or it was a trial strategy he employed, but it did not rise to the level of ineffective assistance of counsel. The court found that counsel could fully and effectively represent Banks and argue the motion for new trial.

### B. Applicable Law

When a defendant requests a substitution of appointed counsel, the trial court is required to permit the defendant to explain his reasons and to give specific instances of counsel's misconduct. (*Marsden, supra,* 2 Cal.3d at p. 124.) Substitution is required only if counsel is not providing adequate assistance or if an irreconcilable conflict exists which is likely to result in ineffective assistance. (*People v. Welch* (1999) 20 Cal.4th 701 728; *People v. Smith* (1993) 6 Cal.4th 684, 696.) The trial court's ruling on a *Marsden* motion is reviewed for an abuse of discretion. (*People v. Welch, supra,* at p. 728.) "Denial [of a *Marsden* motion] 'is not an abuse of discretion unless the defendant has shown that a failure to replace the appointed attorney would "substantially impair" the defendant's right to assistance of counsel. [Citations.]'" (*People v. Barnett* (1998) 17 Cal.4th 1044, 1085.)

### C. Analysis

Banks's first contention that the trial court did not conduct a proper inquiry and that he was not given an opportunity to present his claims of ineffective assistance of counsel is not borne out by the record before us. Initially, the court did not review Banks's handwritten declaration because he was represented by counsel. The court read the letter after Banks conferred with counsel and then specifically asked the court to read it. This triggered the court's duty to conduct a *Marsden* inquiry. (*People v. Mendez* (2008) 161 Cal.App.4th 1362, 1366.) *Marsden* imposes four requirements on a court. (*People v. Mendez, supra,* at p. 1367.) First, the trial court had a duty to allow Banks to articulate why he was dissatisfied with counsel's representation. Finding that Banks stated facts sufficient to raise a question about his counsel's representation, the court then had a duty to make inquiries of counsel. Next, the court had a duty to make a record of Banks's grievances and the court's responses to those grievances. Finally, the trial court was required to make a record of counsel's response to any complaints raised by Banks about his representation. The record before us clearly shows that the trial court adhered

31

to the established procedure and standards for inquiring into his posttrial claims of ineffective assistance of counsel.

Banks also contends the trial court should have appointed new counsel to investigate his claims because requiring trial counsel to first argue that he provided Banks with competent counsel at the *Marsden* hearing, while later permitting him to argue ineffective assistance of counsel in the motion for new trial, "created an inherent conflict of interest between [Banks] and his trial counsel." Banks's contention misunderstands a court's *Marsden* obligation to fully investigate complaints raised by a defendant before appointing new counsel. When a defendant requests substitution of counsel, "the standard expressed in *Marsden* and its progeny applies equally preconviction and postconviction. . . . A defendant has no greater right to substitute counsel at the later stage than the earlier." (*People v. Smith, supra,* 6 Cal.4th 684, 694 (*Smith*).) Whatever stage a *Marsden* motion is made, the trial court must determine whether counsel has been providing competent representation. The inquiry is by nature forward-looking with a view to determine whether counsel can provide effective assistance in the future, but the decision is always based on what happened in the past. (*Smith, supra,* at pp. 694–695.) Here, Banks raised a number of specific claims which dealt primarily with his counsel's trial strategy, including the decision to have the jury continue deliberations. Counsel provided responses to all the court's questions and the court found he performed his duties with reasonable diligence under the circumstances. The court did not "abandon its own constitutional and statutory obligations to make the ultimate determination itself based upon the relevant facts and law" of which it was aware. (*People v. Eastman* (2007) 146 Cal.App.4th 688, 697.)

Banks's conflict of interest claim is also based on a mischaracterization of counsel's arguments. In the written motion for new trial the claim of ineffective assistance of counsel was based on counsel's failure to object to the trial court's "depth charge" instruction. Counsel argued that a competent attorney would have moved to exclude it. During the *Marsden* hearing, counsel explained that he thought the jury

32

should continue deliberations because he was "optimistic" that Banks could get an acquittal. The trial court determined that to be a tactical decision based on counsel's belief "he was going to get [Banks] a not guilty verdict" because no one knew at the time the jury was split 11-1 in favor of guilty.[11] We do not agree with Banks's contention that his counsel's "shift in position" is "inexplicable." Trial counsel's belief at the time of trial that he might secure an acquittal for Banks if the jury were to deliberate further was not contrary or inconsistent with a decision made in hindsight that he should have objected to a further jury instruction.

The California Supreme Court recognized in *Smith, supra,* 6 Cal.4th at p. 694, a defense attorney is placed in an awkward position and "the potential for conflict is obvious" when a defendant claims after trial that counsel was ineffective. However, while noting that "it is difficult for counsel to argue his or her own incompetence" (*ibid.*), the California Supreme Court did not suggest it was impossible for counsel to do so. (*People v. Sanchez* (2011) 53 Cal.4th 80, 89.) We are also cognizant of the undesirable consequences resulting from the appointment of counsel without an adequate showing, for the purpose of arguing that previous counsel was incompetent. In *People v. Makabali* (1993) 14 Cal.App.4th 847, the trial court appointed second counsel to investigate a possible motion to withdraw a guilty plea on the basis of ineffective assistance of counsel. New counsel did not make the motion. On appeal, appointed appellate counsel, defendant's *third* attorney, claimed that the *second* was incompetent for not claiming the *first* was incompetent. Addressing those types of situations, the court in *Smith, supra,* at p. 695, stated: "The spectacle of a series of attorneys appointed at public expense whose sole job, or at least a major portion of whose job, is to claim the previous attorney was, or previous attorneys were, incompetent discredits the legal profession and judicial system, often with little benefit in protecting a defendant's legitimate interests."

---

[11]   Banks's claim of ineffective assistance of counsel contains an analysis of the reasonableness of trial counsel's decision to request further deliberations.

33

We find the trial court made the appropriate inquiries in this case and did not abuse its discretion by denying Banks's motion to replace his attorney and appoint new counsel.

## V.    Ineffective Assistance of Counsel

Banks contends he received ineffective assistance of counsel because trial counsel (1) failed to contest the chain of custody of the DNA swabs, and (2) requested further deliberations after the jury had announced they were deadlocked.

A claim of ineffective assistance of counsel presents a mixed question of law and fact, which we review do novo. (*In re Alcox* (2006) 137 Cal.App.4th 657, 664.) Pursuant to *Strickland v. Washington* (1984) 466 U.S. 668 (*Strickland*), a defendant making a claim that his trial counsel was ineffective must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different. (*Id.* at pp. 668, 687–688, 693–694.) A claim of ineffective assistance of counsel on direct appeal places a heavy burden on appellant. (*People v. Lucas* (1995) 12 Cal.4th 415, 437.)

As to the first prong of *Strickland*, counsel's performance is objectively deficient if it falls below an objective standard of reasonableness under prevailing professional norms. (*People v. Ledesma* (2006) 39 Cal.4th 641, 745–746.) "'Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."' [Citations.] '[W]e accord great deference to counsel's tactical decisions' [citation], and we have explained that 'courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight' [citation]." (*People v. Weaver* (2001) 26 Cal.4th 876, 925–926; accord, *People v. Jones* (2003) 29 Cal.4th 1229, 1254.) "If the record 'sheds no light on why counsel acted or failed to act in the manner challenged,' an appellate claim of ineffective assistance of counsel must be rejected 'unless counsel was asked for an

34

explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' [Citations.]" (*People v. Ledesma, supra,* at p. 746; accord, *People v. Weaver, supra,* at p. 926; *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266; *People v. Fosselman* (1983) 33 Cal.3d 572, 581.) With regard to *Strickland's* second prong, prejudice is established by showing there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. (*Strickland, supra,* 466 U.S. at p. 694.)

### A.    Chain of Custody of DNA Evidence

Detective Wong recovered a pair of gloves from the bushes near a house on South Orange Drive. He gave the gloves and other items he recovered to Detective Shafia, the lead detective on the case. Shafia observed Detective Mark Holguin document and book the gloves into evidence.[12] Lindsey Murray, a DNA analyst, received the DNA samples in heat sealed packages placed in manila envelopes. The seal was intact and Murray would have made a note had the packages arrived with a broken seal.

"In a chain of custody claim, '"[t]he burden on the party offering the evidence is to show to the satisfaction of the trial court that, taking all the circumstances into account including the ease or difficulty with which the particular evidence could have been altered, it is reasonably certain that there was no alteration. [¶] The requirement of reasonable certainty is not met when some vital link in the chain of possession is not accounted for, because then it is as likely as not that the evidence analyzed was not the evidence originally received. Left to such speculation the court must exclude the evidence. [Citations.] Conversely, when it is the barest speculation that there was tampering, it is proper to admit the evidence and let what doubt remains go to its weight." [Citations.]'" (*People v. Catlin* (2001) 26 Cal.4th 81, 134.) '"While a perfect chain of custody is desirable, gaps will not result in the exclusion of the evidence, so long as the

---

[12]    In his reply brief, Banks disputes that Shafia observed Holguin book the gloves into evidence and argues there was no specific reference to gloves. Shafia was asked about the "items" that Detective Wong recovered from the bushes. Those "items" included the gloves.

links offered connect the evidence with the case and raise no serious questions of tampering' . . . ." (*Ibid.*) "[I]t is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case. . . . [Not] everyone who laid hands on the evidence must be called. . . . '[G]aps in the chain [of custody] normally go to the weight of the evidence rather than its admissibility.'" (*Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 311, fn. 1.)

Banks contends the chain of custody of the DNA swabs from the gloves recovered by Detective Wong was never established. He first argues there was "no evidence of when, where, who, or even whether anyone actually swabbed the gloves for DNA," or "how the DNA swabs were packaged and subsequently transmitted to the DNA lab." He further argues he was denied a meritorious defense by trial counsel's failure to challenge the deficiency in the evidence and argue the DNA evidence was unreliable. Banks relies on *People v. Jimenez* (2008) 165 Cal.App.4th 75 (*Jimenez*) to support his argument that the chain of custody is inadequate.

The defendant in *Jimenez* was convicted of robbing a bank, and the issue was whether the trial court erred in admitting a DNA sample and a criminalist's testimony. After robbing the bank, a man fled on a bicycle and abandoned it nearby. (*Jimenez, supra,* 165 Cal.App.4th at pp. 77–78.) A criminalist compared the DNA found on the handlebars of the bicycle with a reference sample supposedly taken from the defendant, and gave testimony indicating the probability that anyone but the defendant left the DNA on the bicycle was extremely low. (*Id.* at pp. 79–80.) At trial, a police sergeant testified "conclusorily" that he made arrangements with a technician to take DNA swabs from the defendant and then either he or the chief investigating officer instructed someone to send the swabs to the criminalist. (*Ibid.*) The criminalist testified that he received the swabs and also the probability that a random person would have the same profile. (*Id.* at p. 79.) On appeal, the *Jimenez* court found the chain of custody to be "woefully inadequate" which raised serious questions as to whether the reference sample had anything to do

with the defendant. (*Id.* at p. 81.) One of the questions the *Jimenez* court wanted to know was whether the swabs were still sealed on arrival at the crime lab. (*Id.* at p. 80.)

Although it is unclear who labeled, sealed, and transported the DNA swabs in this case, it is proper to presume that an official duty has been regularly performed unless there is some evidence to the contrary. (*People v. Lugo* (1962) 203 Cal.App.2d 772, 775; Evid. Code, § 664.) Here, the record contained testimony by the DNA analyst that she received a heat-sealed package containing a swab labeled as "left glove" and another swab labeled as "right glove." The analyst testified that she conducted individual tests on each swab and compared it to a known reference sample of Banks's DNA. Most importantly, the analyst testified the seal on the envelopes was not broken and the packages had not been tampered with.

This case is more like *People v. Riser* (1956) 47 Cal.2d 566 (*Riser*), disapproved on other grounds in *People v. Chapman* (1959) 52 Cal.2d 95, 98, and *People v. Morse* (1964) 60 Cal.2d 631, 648. In *Riser*, the defendant did not point to any indication of actual tampering, did not show how the evidence could have been forged, and did not establish that anyone who might have been interested in tampering with the evidence knew where the evidence was located. (*Riser, supra,* at p. 581.) The *Riser* court concluded that the prosecution is not required to negate all possibility of tampering and upheld the trial court's ruling. (*Id.* at p. 580.) Like the defendant in *Riser*, Banks fails to show the police officers, or the crime lab officials, failed to perform their duties and his allegations raise only the "barest speculation" that the DNA swabs were tampered with while in the custody of law enforcement. (See *People v. Lucas, supra,* 12 Cal.4th at p. 446 (*Lucas*).)

Banks's claim of ineffective assistance of counsel fails because, as demonstrated above, the prosecution had met its burden of establishing chain of custody and, therefore, trial counsel's failure to interpose a chain-of-custody objection to the DNA swabs was not objectively unreasonable. For the same reason, it is not reasonably likely that the trial

37

court would have sustained such an objection and, therefore, Banks has not made the necessary showing of prejudice.

Furthermore, this case is not one in which there simply could be no satisfactory explanation for trial counsel's failure to object because, as the court in *Lucas* stated, in rejecting a claim that counsel was ineffective for failing to object to the chain of custody of a piece of physical evidence, "an objection on chain of custody grounds may be less productive for defendant than a decision to permit the prosecutor to establish a shoddy chain of custody that can be pointed out to the jury in the hope of giving rise to a reasonable doubt." (*Lucas, supra,* 12 Cal.4th at p. 446.) Counsel could have chosen, as Banks now suggests, to object on the ground that some links in the chain of custody were not accounted for. But, as counsel explained during the *Marsden* hearing, he had personally reviewed the DNA envelopes and receipts and consulted with a DNA expert before deciding there was no arguable issue with respect to chain of custody. However, it was also well within the range of competent advocacy for counsel to question the work of the police by making the argument to the jury rather than the trial court. "The decision whether to object to evidence at trial is a matter of tactics and, because of the deference accorded such decisions on appeal, will seldom establish that counsel was incompetent." (*Lucas, supra,* at p. 444.) We conclude Banks has failed to show trial counsel was incompetent for not objecting to the chain of custody of the DNA swabs.

### B.   *Decision to Request Further Deliberations*

After three days of deliberations, the jury announced on a Friday afternoon that they were "hopelessly deadlocked" on all counts in regard to Banks's verdict. The jury had taken three votes and was split 11 to one. Outside the presence of the jury, the trial court proposed that the court either (1) declare a mistrial with respect to Banks, or (2) give the instruction approved by *People v. Moore, supra,* 96 Cal.App.4th 1105, and order the jury to continue deliberations. Banks's trial counsel asked the court to give the instruction and bring the jury back on the following Monday. The trial court stated it would give the instruction and have the jury deliberate for the remainder of the afternoon.

38

If the jury did not reach a verdict by the end of the day, the court stated it would declare a mistrial. The jury returned before the end of the day with guilty verdicts on all counts.

Given the circumstances of this case, Banks contends his counsel's tactical decision to request further deliberations is not immune from a claim of ineffective assistance of counsel. Banks points to the positive identification by the eyewitnesses, the DNA evidence, and the link to the getaway car, and argues, in essence, the evidence of guilt was so overwhelming that it was not reasonable for trial counsel to believe that the jury was split in favor of acquittal.

""'"Tactical errors are generally not deemed reversible, and counsel's decision-making must be evaluated in the context of the available facts." [Citation.]'" (*People v. Jones, supra,* 29 Cal.4th at p. 1254.) Here, the record indicates the reasons for counsel's tactical decision to ask for further deliberations. First, the jury heard no evidence of Banks's gang membership because trial counsel succeeded in excluding that evidence in a pretrial motion. Next, the prosecution presented a number of percipient witnesses whose description of Banks varied to some degree. Simmons testified the shooter did not have glasses and was not wearing gloves. He stated the shooter wore a loose type of head wrap that was tan in color. Chavero said the shooter was approximately six feet tall and said Banks wore glasses and one black glove. Renteria testified the shooter was either 5 feet 4 or 5 feet 5 inches tall. Hustead testified that Banks wore glasses and a baseball cap. Our review of the record shows that trial counsel vigorously cross-examined the eyewitnesses in terms of the inconsistencies. The trial court commented on counsel's effectiveness during the *Marsden* hearing. On the second day of jury deliberations the jury requested a readback of Simmons's testimony. On the third day of jury deliberations the jury requested a readback of Hustead's testimony. Given that the jury requested those readbacks, it was reasonable for counsel to believe the jury questioned Banks's identification.

Trial counsel questioned Shafia about the gloves that were recovered near a house on South Orange Drive. Banks's DNA was found on those gloves but was not found

39

inside the dispensary or on the glove recovered at the scene.  The jury asked for a readback of Shafia's testimony concerning the placement of a camera on South Orange Drive and also requested the entire testimony of Lindsey Murray, the DNA technician. Given trial counsel's attack on the integrity of the DNA evidence in cross-examination and closing statement, and the jury's requests for readback of testimony, it was reasonable for trial counsel to believe the jury had questions on this issue also.

During the *Marsden* hearing, trial counsel stated that he believed further deliberations would be to Banks's benefit and he was optimistic he could get an acquittal. Evaluating trial counsel's tactical decision "'in the context of the available facts'" as we must, and not "'in the harsh light of hindsight,'" we conclude trial counsel's decision to request further jury deliberations was a reasonable tactical decision.  (*People v. Weaver, supra,* 26 Cal.4th at pp. 925, 926.)

## VI.    Abstracts of Judgment

### Banks

The jury found the firearm allegation under section 12022.53, subdivisions (d) and (e) to be true, that a principal personally and intentionally discharged a firearm.  The trial court imposed a sentence of 25 years to life under section 12022.53, subdivision (e), but the abstract of judgment designated section 12022.53, subdivision (d).  The People concede the error.  Accordingly, the abstract of judgment should be amended to reflect the trial court's oral pronouncement.[13]  (*People v. Jones* (2012) 54 Cal.4th 1, 89.)

### Matthews

The trial court imposed a $200 parole revocation fine (Pen. Code, § 1202.45), which was stayed pending successful completion of parole.  The People concede, and we agree, that because Matthews was sentenced to a life term without the possibility of parole, no parole revocation fine could be imposed.  (*People v. Petznick* (2003) 114

---

[13]    The same error occurred in Matthews's abstract of judgment and it must also be amended.

Cal.App.4th 663, 687.) Accordingly, that portion of the court's judgment imposing a parole revocation fine shall be stricken.[14]

Matthews also contends the determinate term of 32 years and 8 months on counts 2 and 3 was incorrectly computed. The trial court sentenced Matthews to the low term of 16 months doubled for the prior strike conviction, plus five years for the prior serious felony, plus 25 years for the firearm enhancement. The sentence was correctly computed by the trial court.

---

[14] The same error occurred with respect to Banks and that portion of the court's judgment imposing a parole revocation fine shall be stricken.

# DISPOSITION

The judgment as to Leon Banks is affirmed. The abstract of judgment should be amended to reflect that Banks was sentenced pursuant to section 12022.53, subdivision (e), and the parole revocation fine imposed pursuant to section 1202.45, must be stricken.

The judgment as to Lovie Troy Matthews is affirmed. The abstract of judgment should be amended to reflect that Matthews was sentenced pursuant to section 12022.53, subdivision (e), and the parole revocation fine imposed pursuant to section 1202.45, must be stricken.

The clerk of the Superior Court is directed to prepare an amended abstract of judgment reflecting these modifications and to forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.

The judgments are affirmed as modified.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J. *

FERNS

We concur:


_____, Acting P. J.

ASHMANN-GERST


_____, J.

CHAVEZ

---

*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

42